UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

AMANDA BEECH                          CIVIL ACTION

VERSUS                                NO: 10-146

HERCULES DRILLING COMPANY,            SECTION: J(2)
LLC

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the Court is a Jones Act suit for wrongful death. Plaintiff Amanda Beech, individually and as tutrix and guardian of her minor child, Jax Delton Beech, seeks recovery against Defendant Hercules Drilling Company, L.L.C., ("Hercules") for the wrongful death of her husband Keith Beech.

On September 10, 2010, this Court granted summary judgment in favor of Defendant, dismissing Plaintiff's claims regarding punitive damages, the issue of conspiracy to commit fraud and negligent or intentional infliction of emotional distress, and the issue of conscious pain and suffering. On September 15, 2010, this Court granted summary judgment in favor of Defendant, dismissing Plaintiff's claims alleging unseaworthiness. Only Plaintiff's claims for negligence and vicarious liability against Hercules remain. A bench trial on the merits was held on December 20, 2010, and this matter was taken under advisement.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law.

## BACKGROUND FACTS

The facts of this case are not substantially in dispute. Mr. Beech died on December 13, 2009, when he was accidentally shot by the handgun of co-worker Michael Cosenza.  At that time, Mr. Beech was employed by Hercules as a Crane Operator aboard the HERCULES 101, a jack-up drilling vessel owned by Hercules.  At all relevant times the HERCULES 101 was not under charter but was stacked and awaiting a contract.  The remaining crew on December 13, 2009, consisted of Allen West (Offshore Installation Manager), Michael Cosenza (Driller), and Timothy Slaydon (Senior Mechanic).  The four-man crew worked a fourteen-day hitch, commencing December 4, 2009.

When he came aboard the HERCULES 101, Mr. Cosenza brought a small handgun, a 22-Derringer pistol, aboard with him.  Mr. Cosenza's action of bringing the handgun aboard the rig was contrary to Hercules' company policy, and Mr. Cosenza was aware of Hercules' prohibition against weapons.  Mr. Cosenza did not intentionally violate the weapon prohibition by bringing the handgun onto the rig and instead discovered the gun in a pocket while going through some laundry he had brought onboard. Hercules' policy against weapons was clearly delineated in two separate manuals—the Health, Safety, and Environmental Manual ("HSE Manual") and the Employee Handbook—as well as various other notices, forms, and agreements.

2

The HSE Manual contained provisions to the effect that employees were encouraged and required to report any "concerns regarding health and safety of personnel or environmental compliance without fear of adverse repercussions."  Additionally, when an unsafe condition became apparent during work, a "time out" was to be called so that the danger could be addressed immediately.

The Employee Handbook stated: "The use of or possession of . . . firearms or other weapons on Hercules Drilling's premises is prohibited.  Any persons on Hercules Drilling rigs in violation of this policy will be subject to disciplinary action including immediate termination."  There was a sign at the dock from which the crew disembarked stating that weapons were prohibited onboard.  On at least one occasion, Mr. Cosenza signed an undated Acknowledgment that read "I have received, read, and understand the Hercules Offshore Corporation 'POLICY ON SEARCH AND SEIZURE, DRUGS, ALCOHOL, CHEMICALS, SUBSTANCES, FIREARMS AND WEAPONS IN THE WORKPLACE.'"  He also signed a document entitled "HERCULES OFFSHORE CORPORATION COMPANY POLICY PERTAINING TO ILLEGAL OR UNAUTHORIZED . . . FIREARMS/WEAPONS," which stated in pertinent part: "In accordance with [Hercules'] long standing commitment to provide a safe environment for all employees, notice is served to all . . . employees . . . that ILLEGAL OR UNAUTHORIZED . . . FIREARMS/WEAPONS ARE NOT PERMITTED ON BOARD ANY HERCULES RIG OR

AT ANY OF ITS OFFICES OR LAND INSTALLATIONS."

As a driller, Mr. Cosenza was expected to enforce this policy.  Hercules reserved the right to search its personnel for contraband or conduct random drug-testing.  There is conflicting testimony as to whether any such searches were conducted in the five years leading up to Mr. Beech's death, but even Hercules admits such searches were rarely conducted.

Prior to December 13, 2009, Mr. Cosenza did not tell anyone that he inadvertently brought the handgun, which he had kept hidden in his locker, onto the rig.  That evening, he was assigned to work the night shift and was the only crewman on duty.  His duties during that shift included monitoring the generators, checking equipment, supervising, and reporting any unusual activities or problems.  Because the rig was stacked and because there is a high risk of injury to a lone crew member who attempts to work outside alone after dark, Mr. Cosenza was not expected to go outside on the rig for extended periods of time during his night shift.  Instead, he was expected to spend most of his shift inside.  Between rounds, he was permitted to watch television or converse with other crew members.

Around 9:30 p.m., Mr. Beech was not on tour but was aboard the vessel subject to the call of duty.  He was in the rig's TV room watching television.  Mr. Cosenza and Mr. Beech engaged in casual conversation, during which Mr. Beech mentioned that he was

4

thinking about purchasing a small handgun for his wife to use for self-defense.  Mr. Cosenza thought Mr. Beech might be interested in seeing his 22-Derringer pistol and went to his locker to retrieve it.  It is unclear whether Mr. Beech knew that the gun was onboard until the moment Mr. Cosenza returned with the pistol in his hand.  There is no evidence that Mr. Beech touched or handled the gun.  As Mr. Cosenza attempted to sit down in the TV room, his arm bumped into a part of the couch and the handgun accidentally discharged.  The bullet struck Mr. Beech's arm and then traveled into his head.  Mr. Beech died approximately thirty minutes later and apparently did not undergo any conscious pain or suffering as the result of being shot.

Initially, Mr. Cosenza panicked and threw the handgun overboard before alerting the other crew members and fabricating a story about what happened.  Within one hour, however, Mr. Cosenza admitted the truth about his role in the accident.  There were no other witnesses to the shooting, and there is no evidence that there had been any type of disagreement or ill feeling between Mr. Cosenza and Mr. Beech.  This Court finds that the shooting was entirely accidental.

## LIABILITY UNDER THE JONES ACT

The Jones Act, 46 U.S.C.A. § 30101 <u>et seq.</u> (2006), provides a cause of action in negligence for any seaman injured in the course of his employment.  <u>Chandris, Inc. v. Latsis</u>, 515 U.S.

347, 354 (1995).  If the seaman dies from the injury, the
personal representative of the seaman may elect to bring suit
against the employer, 46 U.S.C.A. § 30104, and a Jones Act
employer may be vicariously liable for the tortious acts of its
employees.  Landry v. Oceanic Contractors, Inc., 731 F.2d 299,
303 (5th Cir. 1984).  The Jones Act creates a "uniform system of
seamen's tort law parallel to that available to employees of
interstate railway carriers under FELA [ Federal Employers'
Liability Act, 45 U.S.C.A. §§ 51–60]."  Miles v. Apex Marine
Corp., 498 U.S. 19, 29 (1990).  As a result, courts readily apply
FELA case law to Jones Act cases.  See Sobieski v. Ispat Island,
Inc., 413 F.3d 628, 631 (7th Cir. 2005) ("FELA case law is
broadly applicable in the Jones Act context.").  In this case,
there is no dispute that Mr. Cosenza and Mr. Beech were seamen
under the Jones Act.  Mr. Cosenza and Mr. Beech worked for
Hercules, the vessel owner, and both men were assigned to the
HERCULES 101, a vessel in navigation under the Jones Act.

     The parties dispute whether Mr. Beech was injured in the
course and scope of his employment as required by the Jones Act.
Hercules argues that Mr. Beech was not within the course and
scope of his employment because he was not engaged in any type of
work at the time of the shooting.  Rather, he was off-duty,
laying on the couch, and watching television.  This argument is
unpersuasive in light of the myriad of cases that have addressed

the issue.  It is a long-established and widely-accepted principle that "course and scope" under the Jones Act is a broader standard than that applied to land-based employees.  The United States Supreme Court has stated that "[u]nlike men employed in service on land, the seaman, when he finishes his day's work, is neither relieved of obligations to his employer nor wholly free to dispose of his leisure as he sees fit.  Of necessity, during the voyage he must eat, drink, lodge and divert himself within the confines of the ship." Aguilar v. Standard Oil Co., 318 U.S. 724, 731-32 (1943).  Likewise, the Fifth Circuit Court of Appeals has found that "[s]cope of employment has been interpreted to encompass acts incidental to the employment as well as the actual work." Fowler v. Seaboard Coastline R.R. Co., 638 F.2d 17, 20 (5th Cir. 1981) (FELA case). Finally, the Ninth Circuit Court of Appeals has held that "[t]he employment of a seaman includes . . . the performance of such ordinary tasks for his own comfort and convenience as are incident to and necessarily connected with the employment." Sundberg v. Wash. Fish & Oyster Co., 138 F.2d 801, 803 (9th Cir. 1943) (quoting States S.S. Co. v. Berglann, 41 F.2d 456, 457 (9th Cir. 1930)).

It is clear that Mr. Beech, who was onboard the HERCULES 101 and subject to the call of duty at the time he was shot, was within the course and scope of his employment.  Accordingly,

Plaintiff is a proper Jones Act plaintiff in this matter and has elected to sue Hercules in a representative capacity for the fatal shooting of her husband.

### HERCULES' VICARIOUS LIABILITY UNDER THE JONES ACT

The doctrine of *respondeat superior* applies in Jones Act cases.  <u>Landry v. Oceanic Contractors, Inc.</u>, 731 F.2d 299, 303 (5th Cir. 1984).  Naturally, there can be no vicarious liability if the employee causing the harm was not negligent himself. Thus, the first question when analyzing Hercules' vicarious liability is whether its employee, Mr. Cosenza, was negligent in causing Mr. Beech's death.  Here, the parties agree that Mr. Cosenza's negligence in handling his 22-Derringer pistol caused the death of Mr. Beech when his handgun accidentally discharged on December 13, 2009.

An employer is only liable for the wrongful acts committed by its employee when the employee's tortious conduct is in furtherance of the employer's business.  <u>Stoot v. D&D Catering Serv., Inc.</u>, 807 F.2d 1197, 1199 (5th Cir. 1987).  Therefore, if Mr. Cosenza's actions were within the course and scope of his employment, Plaintiff can recover from Hercules under the Jones Act.  On the other hand, if Mr. Cosenza's actions were not within the course and scope of his employment, Hercules would not be vicariously liable for his actions.

It is important to distinguish between the course and scope

of employment test required for a Jones Act employee to recover for injuries caused by the *employer's* negligence and the different standards applied to evaluate the employer's vicarious liability for an *employee's* tortious conduct.  In a seaman's suit against his employer for *direct* negligence, the question is whether the injured seaman was in the course and scope of employment at the time of his injury.  See Fowler, 638 F.2d at 20 (applying "scope of employment" test, which includes acts incidental to the employment as well as the actual work, to plaintiff alleging employer's direct negligence).  To recover under a theory of vicarious liability, however, the seaman must also demonstrate that the employee whose conduct caused the harm was acting within the course and scope of his employment.  See Stoot, 807 F.2d at 1199 (applying vicarious liability standard for intentional tort); cf. Guidry v. South Louisiana Contractors, Inc., 614 F.2d 447 (5th Cir.1980) (applying broader test to determine which employer should be sued under vicarious liability in negligence case).

In Guidry, a seaman was injured by a barge captain's negligence.  While walking out on the elevated boom of a dragline to adjust a cable, Guidry was thrown from it.  614 F.2d at 451. The Fifth Circuit identified the standard for determining vicarious liability as "whether, at the moment he was doing the work that led to [the Plaintiff's] injury, . . . [the employee]

9

was acting in the business of and under the control of" the employer.  Id. at 455.  However, the issue in Guidry was not whether the employer would be vicariously liable, but which of two possible employers (general employer or borrowing employer) would potentially be liable.  Id.  The court noted that "vicarious liability is a separate question and does not necessarily turn solely on employment status."  Id.

     In Stoot v. D&D Catering Service, Inc., the Fifth Circuit addressed more directly the standard for evaluating an employee's course and scope of employment for vicarious liability under the Jones Act.  The court determined that a contractor's catering employee was not acting in the course and scope of her employment when she attacked and stabbed a seaman during a dispute about serving meals during irregular times.  Stoot, 807 F.2d at 1200.  Calling it "a close case," the Fifth Circuit's reasoning turned on the tortfeasor's motivation for engaging in the conduct that caused the harm.  Id.  Finding that the aggressor was motivated by "anger and revenge . . . rather than for reasons related to her employment," the court did not find the employer vicariously liable.  Id.  The court noted that, "[a]lthough whether a given act by an employee is committed within the course and scope of his employment is highly factual, the facts must be analyzed within the framework of established agency principles."  Id. at 1199-1200.

While these cases provide some guidance, this Court is aware of no Fifth Circuit precedent addressing a situation precisely like the instant case, which involves a negligently-inflicted injury facilitated by the knowing violation of a company safety rule.  Indeed, the prior cases in this district that address the question create rather murky waters.

In Offshore Logistics, Inc. v. Astro-Marine, Inc., two captains engaged in a fist fight—intentional tortious conduct—when one tried to confiscate some wine being served on-board a vessel, claiming it was prohibited by company policy. 482 F. Supp. 1119, 1120 (E.D. La. 1980).  The second captain tried to persuade the first captain to allow the drinking to continue, and a fight ensued.  Id.  The employer was not found vicariously liable for injuries resulting from the fight because the court determined that the motivation for interrupting the drinking party was racially motivated and not truly for the purpose of enforcing company policy; thus, the first captain was found not to be in the course and scope of his employment.  Id. at 1122.

Judge Fallon reached a different conclusion in In re Gulf Pride Marine Service, Inc., 1997 WL 118394 (E.D. La. Mar. 14, 1997).  There, the court found a captain to be acting within the course and scope of his employment when his double-barrel shotgun discharged during his attempt to evict unwanted guests.  Id. at

11

*8.  The captain pointed the gun at one of the guests, who pushed it away, causing the captain to slip on wet paint.  Id. at *3. At that moment, the gun discharged, wounding a deckhand in the head.  Id.  The captain was largely responsible for the events leading up to the injury: he was under the influence of drugs and alcohol; he invited the unwanted guests on board earlier that evening; in an angry rage, he knocked over the paint on which he later slipped; and he chose to use a shotgun to evict the guests rather than call or radio for help.  Id. at *8.  Nevertheless, at the critical moment, he was found to be furthering the employer's business because evicting potential threats (the guests) is among the duties of a captain.  Id.  Furthermore, his actions were deemed to constitute mere negligence, not intentional harm.  Id.

Although Offshore Logistics and Gulf Pride both involved a captain who sought to enforce the ship's rules, and both captains engaged in tortious conduct, the court reached different conclusions as to whether, at the time of the injury, each captain acted within the course and scope of his employment.  Two insights may be gleaned from these cases, which help to explain the different holdings.  First, the captain in Gulf Pride was merely negligent in allowing the gun to discharge, whereas the captain in Offshore Logistics engaged in the intentional act. Second, the motivation for the conduct that caused the harm was significant to the outcome in each case.  Unlike in Gulf Pride,

12

where the court concluded that the misguided and intoxicated captain was nonetheless acting in the interest of his employer, the captain in Offshore Logistics was found to have an ulterior, malicious motive for enforcing the ship's policy against drinking.  Thus, an employee whose wrongful, negligent conduct results in accidental injury to a fellow employee still acts in the course and scope of his employment for purposes of vicarious liability, unless the act is motivated by some purpose inimical to the interests of the employer or co-worker.

Gulf Pride is more analogous to the instant case because the injury there occurred when a shotgun accidentally discharged, which was not an intentional act.  Like Mr. Cosenza's decision to get his handgun, the court in Gulf Pride indicated that the captain's decision to retrieve the gun from his car was poor. Gulf Pride is distinguishable from the instant case, however, because the Gulf Pride captain's objective of evicting unwanted guests was more clearly related to his official duties than Mr. Cosenza's more personal motivation for retrieving the pistol from his bunk.  Still, the negligent infliction of the injury in Gulf Pride was an important factor in the court's analysis.  The court's reasoning suggests that, had the gun been intentionally discharged, the captain would not have been found to be within the course and scope of his employment.  When analyzing whether an employee acted in the course and scope of his employment, the

13

intent of the employee at the critical moment—malicious or benevolent—is the most important factor.

Neither Offshore Logistics nor Gulf Pride, though, is squarely on-point. Mr. Cosenza was not seeking to actively enforce Hercules' rules at the time of the accident. In fact, he violated a safety rule by possessing the handgun. Initially, Mr. Cosenza handled the gun in a purposeful manner, demonstrating it to Mr. Beech. It was not until a few minutes later, however, as Mr. Cosenza was taking a seat on the couch, that the handgun bumped against something and accidentally discharged. Analyzing the standard for determining course and scope of employment in this context is a matter of first impression in the Fifth Circuit.

The law in other circuits is not settled. Plaintiff relies on Sundberg v. Washington Fish & Oyster Co., a Ninth Circuit maintenance and cure case, where a seaman was accidentally shot in the wrist as a fellow crew member aimed his rifle at a nearby sea lion. 138 F.2d 801, 802 (9th Cir. 1943). However, Sundberg did not address the issue of vicarious liability under the Jones Act. Because the employer had full knowledge of the dangerous conduct and failed to prevent it, the suit was against the employer for direct negligence. Id. Unlike the instant case, the question in Sundberg was whether the injured seaman was outside the "course of his employment" as a participant in the

14

shooting of sea lions.  Id. at 803.

The Seventh Circuit Court of Appeals once stated that "[t]he peculiarity of the Federal Employers' Liability Act is that it makes the carrier liable for 'the negligence of any of the officers, agents, or employees of such carrier,' 45 U.S.C. § 51, and there is no suggestion (though it may well be implicit) of any limitation to acts by these persons in furtherance of the carrier's business." Lancaster v. Norfolk and W. Ry. Co., 773 F.2d 807, 817 (7th Cir.1985).  Hercules relies heavily on a more recent case, Sobieski v. Ispat Island, Inc., where a seaman was acting as a chiropractor in the vessel's recreation room.  413 F.3d 628, 629 (7th Cir. 2005).  The seaman was not a professional chiropractor, nor was he authorized by the employer to engage in back-cracking onboard.  Id. at 634.  The Seventh Circuit's test for vicarious liability under the Jones Act was whether the employee's tort, negligent or intentional, was "committed in furtherance of the employer's business." Id. at 632.  The court held that "in order for an activity to qualify as being within the scope of employment, it must be a necessary incident of the day's work or be essential to the performance of the work." Id. at 634 (quoting Rogers v. Chicago & N. W. Transp. Co., 947 F.2d 837, 839 (7th Cir. 1991)).  Applying that standard, the court held that cracking backs is not within the duties of a mate's assistant, and the employer was not vicariously liable.

Sobieski, 413 F.3d at 634-35.  The court found it significant that the employer was not on notice that the employee had a propensity to crack backs and could therefore take no measures to prevent the harm.  Id. at 634.

The Sixth Circuit Court of Appeals applies a much broader test for vicarious liability under the Jones Act or FELA than the Seventh Circuit.  In Baker v. Baltimore & Ohio R.R. Co., a FELA case, a railway employee was on a lunch break from his job inspecting railroad cars for the employer when a co-worker picked up a coat, causing a pistol to fall out of the pocket.  502 F.2d 638, 640 (6th Cir. 1974).  The gun discharged upon hitting the ground and wounded the employee in the leg.  Id.  The employer argued that it was not liable for the negligence of the co-worker because the negligence did not occur in the course and scope of his employment.  Id. at 641.  The Sixth Circuit found that it was not necessary to show that the co-worker was acting in furtherance of the employer's business because course and scope of employment "includes not only actual service, but also those things necessarily incident thereto."  Id. at 641-42 (quoting Virginian Ry. Co. v. Early, 130 F.2d 548, 550 (4th Cir. 1942)).  The court noted that "[u]nder the FELA a defendant's liability for the negligence of its servants is not restricted by the common law doctrine of respondeat superior."  Baker, 502 F.2d at 641.  However, Baker is distinguishable from the instant case

16

because, unlike Hercules, the railroad employer did not have any rules prohibiting the carrying of pistols by its car inspectors. Id. at 640.

The Tenth Circuit Court of Appeals has addressed vicarious liability under the Jones Act in the context of a "prank."  In Copeland v. St. Louis-San Francisco Ry. Co., the court extended a rule protecting employers from liability where intentional acts "are not committed within the scope of the wrongdoers' employment in furtherance of the master's business" to include situations where a fellow employee is injured by another during instances of "sport or in play."  291 F.2d 119, 121 (10th Cir. 1961).  The undisputed evidence in the case demonstrated that the plaintiff's injury was caused by a co-worker "who was acting entirely upon his own impulse, for his own amusement, and for no purpose of or benefit to the defendant employer."  Id. at 120.  The Tenth Circuit specifically distinguished the facts from a situation where the harm results from the  "willful act of an employee attempting to accomplish the master's business in an improper manner."  Id.

The Court finds that Mr. Cosenza was negligent in a number of respects, including the following: he was negligent in bringing the handgun aboard the vessel, he was negligent in failing to secure the gun after he discovered it in his laundry, he was negligent in carrying the gun on his person while he was

17

on duty, and he was negligent in causing the gun to accidentally discharge as he was in the act of sitting down onto the couch.

The facts of this case fall somewhere between the negligent actions in Guidry and the intentional battery in Stoot.   Stoot provides the clearest statement of the applicable test in the Fifth Circuit for vicarious liability under the Jones Act, but that case specifically cites authority that governs *intentional* torts, not the negligent conduct at issue here.   After a thorough review of the precedent in this district and in the Fifth Circuit, the Court can find no binding authority that speaks to the unique facts of this case.   For the following reasons, the Court finds that Mr. Cosenza was acting in the course and scope of his employment for purposes of attaching vicarious liability to Hercules under the Jones Act.

On the night of December 13, 2009, Mr. Cosenza was not just on-call, but on-duty.   It is true that Mr. Cosenza was not tending to the vessel or engaged in the typical duties of a driller at the precise moment his handgun discharged.   However, Mr. Cosenza was still acting in the course and scope of his employment because he was not only permitted, but encouraged, to stay indoors and enjoy periods of relaxation and social interaction during his shift.

Although Mr. Cosenza violated company policy by having a handgun on the vessel, this fact alone is not dispositive and

18

does not preclude the imposition of vicarious liability on Hercules.  Such a rule would draw too bright a line.  Plaintiff notes that under a strict company policy violation test, an employer would be relieved of vicarious liability in absurd situations.  For example, if a crane operator uses his cell phone in violation of a company safety policy and then drops the crane boom on top of a worker below, the employer would be relieved of vicarious liability.  The same result might follow if a supervisor instructs a fatigued employee to work hours in excess of a safety rule, or if an intoxicated employee causes a workplace injury to another worker.  The Jones Act is not a workers compensation statute and does not impose strict liability on the employer for any injuries sustained by employees.  However, it is a remedial statute, and the Supreme Court has recognized that Congress' purpose was to extend additional benefits and protections to seamen injured as the result of negligence.  Atlantic Sounding Co., Inc. v. Townsend, 129 S. Ct. 2561, 2570 (2009).  Permitting an employer to avoid Jones Act liability merely because an on-duty employee breached established safety rules does not seem to fulfill Congress' intent.  See Baker, 502 F.2d at 641 ("FELA's liberal purpose must be kept in mind when confronting arguments that would restrict an employer's liability under the Act.").

The evidence indicates that Mr. Cosenza did not expect or

believe that his actions would have negative consequences.  He was familiar with the pistol and understood its operation and features.  He did not bring the gun into a crowded room or an area where it might be treacherous to move around without both hands free.  He did not playfully aim the gun at any person.  Nonetheless, his negligent conduct caused serious, though unintended, harm.  Some courts label this formula as a prank and apply a narrow intentional tort course and scope of employment analysis.  See, e.g., Copeland, 291 F.2d at 121 (treating acts of sport or play as a prank).  The specific facts here do not fit neatly into a prank context, however.  See Baker, 502 F.2d at 641 n.2 (distinguishing Copeland because act did not constitute a "practical joke").  Although Mr. Cosenza's initial handling of the gun could be compared to sport or play, at the critical moment of discharge Mr. Cosenza's only intent was to sit down, albeit in passive possession of the pistol.  There was no intent to scare, startle, surprise, or stun Mr. Beech.

Furthermore, this is not a case of utter disregard for duty.  There is no evidence that Mr. Cosenza failed to complete his assigned night-watch tasks at appropriate intervals that evening.  Additionally, Mr. Cosenza was clearly  under the control of Hercules at the time of the accident.  He did not have the option, for example, to go to bed for the night or leave the vessel for rest or recreation.  Instead, Mr. Cosenza was required

20

to remain awake and alert as the sole crew member on-duty at the time. The Court therefore finds that Mr. Cosenza acted in the course and scope of his employment.

This is a case involving mere negligence, not an intentional tort. It follows that, if <u>Stoot</u>—which involved the intentional stabbing of a crew member—presented a "close call" for the Fifth Circuit, *a fortiori*, cases involving mere negligent infliction of injury should likely be decided in favor of the injured seaman.

The evidence overwhelmingly indicates that Mr. Cosenza did not intend to harm or injure Mr. Beech in any way. Although the precise sequence of events is not entirely clear, the most credible evidence supports the conclusion that at the time Mr. Cosenza's handgun discharged and injured Mr. Beech, Mr. Cosenza had abandoned his purpose of showing off the gun and was in the process of sitting down on the couch to watch television. Because of the potential dangers associated with having a single crew member on duty at night, Mr. Cosenza was cautioned by Hercules not to do too much. In fact, Hercules encouraged Mr. Cosenza to watch television between rounds, while on-duty. Conversation with other crew members, even when touching upon personal matters, was therefore well within the permissible boundaries of his job activity that night. Thus, the Court finds that at the critical moment—when the gun discharged—Mr. Cosenza was acting in the course and scope of his employment.

## COMPARATIVE FAULT OF MR. BEECH

Having found Hercules vicariously liable for Mr. Beech's death, the next question is whether Plaintiff's recovery should be reduced due to Mr. Beech's own comparative fault.  In Jones Act cases, the comparative fault of an injured seaman does not bar recovery, but the amount recovered shall be reduced proportionately to his fault.  <u>Gavagan v. United States</u>, 955 F.2d 1016, 1022 (5th Cir. 1992).

As discussed above, Mr. Beech was obviously aware of Hercules' policy prohibiting handguns on the vessel.  Mr. Cosenza testified that Mr. Beech did not ask Mr. Cosenza to retrieve the gun from his locker.  Also, Mr. Beech did not touch or handle the gun that night.  In fact, Mr. Cosenza testified that the entire conversation about the handgun took ten or fifteen seconds.  Mr. Cosenza was a driller and was in charge of the stacked vessel at night.  At that time, Mr. Beech was subject to orders from Mr. Cosenza.  Although every crew member, including Mr. Beech, was trained to call a "time out" and alert a supervisor when he became aware of a breach of a safety rule, given the brief time between seeing the handgun and its discharge, Mr. Beech did not have a reasonable opportunity to respond to the situation.  Therefore, the Court finds that Mr. Beech was not comparatively negligent.

**DAMAGES**

Based on the foregoing findings of fact and conclusions of law, the Court finds that Plaintiff has sustained damages due to the negligence of Mr. Cosenza, for which Hercules is vicariously liable.  Accordingly, Plaintiff is entitled to recover from Hercules the following damages:[1]

At the time of his death, Mr. Beech was survived by his wife, Plaintiff Amanda Beech, who was then pregnant with their first child.  They had been married for three years and four months.  Their son, Jax Delton Beech, was born on April 11, 2010. Jax is a "special needs" child, born with spina bifida and partial paralysis.  His mental capacity is projected to be on the low end of normal.  He has club feet and wears braces.  He suffers from bowel and bladder problems and needs to be catheterized every three hours.  At the time of her husband's death, Plaintiff was employed as a hairdresser earning about $20 per hour.

Mr. Beech was very much a handyman around the home.  He built his own house, cut grass (nine acres), maintained a tractor and various other vehicles, and helped with household chores.

---

[1] Hercules' **Motion in Limine to Exclude Evidence of Non-Pecuniary Damages and Cumulative Testimony (Rec. Doc. 86)** and Plaintiff's **Motion in Opposition to Hercules' Amendment to the Pre-Trial Order and in Opposition to the New Exhibit (Rec. Doc. 107)** are denied as moot, as testimony on non-pecuniary damages and cumulative testimony were not presented at trial, and the new exhibit submitted by Hercules does not alter the Court's reasoning above.

Since he worked fourteen-day hitches, Mr. Beech was home at least half of the year.  During that time, Plaintiff testified that Mr. Beech would spend three or four hours each day working around the home.

Since this is a Jones Act case, Plaintiff is not entitled to recover non-pecuniary damages for loss of society, loss of consortium, survivors' grief, bereavement, or mental anguish. Miles v. Apex Marine Corp., 498 U.S. 19, 32-33 (1990); Thompson v. Offshore Co., 440 F. Supp. 752, 764-65 (S.D. Tex. 1977).

Pecuniary damages that are recoverable include "loss of support from [decedent's] past and future earnings; loss of [decedent's] household services; loss of parental, nurture and guidance of his minor children until the age of majority; and recovery for [decedent's] predeath pain and suffering." De Centeno v. Gulf Fleet Crews, Inc., 798 F.2d 138, 141 (5th Cir. 1986).

Mr. Beech was born on December 29, 1978.  At the time of his death on December 13, 2009, he was just shy of thirty-one years of age.  He had a work-life expectancy of approximately twenty-eight years.  Dr. Randy Rice, expert economist, calculated loss of support using after tax earnings, discounting to present value, and assuming personal consumption of 22.5%.  Based on this evidence, the Court finds that the sum of $969,329 fairly compensates Plaintiff and her minor son for loss of past and

24

future support.  For purposes of entry of judgment, the Court allocates the award for loss of support 75% to Plaintiff ($726,997) and 25% to the minor Jax Beech ($242,332).

Based on the evidence at trial, the Court awards Plaintiff $150,000 for loss of Mr. Beech's household services and $75,000 for Jax Beech's loss of nurture and guidance until age eighteen. The Court has previously dismissed any claim for Mr. Beech's pain and suffering based on undisputed evidence that he did not suffer any conscious pain prior to death.

Judgement will be entered in accordance with this opinion.


New Orleans, Louisiana, this 24th day of March, 2011.


_____
CARL J. BARBIER
UNITED STATES DISTRICT COURT